279 F.Supp. 532 (1968)
George H. WINKLE, Petitioner,
v.
George A. KROPP, Warden, State Prison of Southern Michigan, Respondent.
Civ. A. No. 28558.
United States District Court E. D. Michigan, S. D.
February 2, 1968.
*533 D. Michael Kratchman, Detroit, Mich., for petitioner.
Frank J. Kelley, Atty. Gen. of Michigan, and Robert C. Goussy and William J. Mullaney, Asst. Attys. Gen., for respondent.

OPINION AND ORDER GRANTING WRIT OF HABEAS CORPUS
McCREE, Circuit Judge (sitting by designation).
This is a petition for a writ of habeas corpus. Petitioner, George H. Winkle, was convicted in a Michigan circuit court of carrying a concealed weapon and of having possession of burglar tools, and is presently incarcerated in the State Penitentiary of Southern Michigan. He contends that the evidence upon which his conviction was based was obtained through an unreasonable search in violation of the Fourth Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, and which provides:
The right of the people to be secure in their houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Respondent contends that the search which disclosed the damaging evidence was, by accepted judicial standards, a reasonable one, and that, in any event, the evidence was rendered admissible by the following proviso in the section of the Michigan Constitution which prohibits unreasonable searches and seizures:
Provided, however, That the provisions of this section shall not be construed to bar from evidence in any court of criminal jurisdiction * * * any narcotic drug or drugs, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slungshot, billy, metallic knuckles, gas-ejecting device, or any other dangerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in this state. Mich.Const. of 1908 (as amended), Art. II, § 10.
Petitioner contends, with regard to this proviso, that it violates the Fourth Amendment and can therefore not be relied upon by state courts to render evidence admissible.
Winkle's conviction was affirmed by the Michigan Supreme Court in People v. Winkle, 358 Mich. 551, 100 N.W.2d 309 (1960). The petition for habeas corpus and certiorari which he filed in the Michigan courts was denied. He then sought Supreme Court review of this denial of post-conviction relief, and in Winkle v. Bannan, 368 U.S. 34, 82 S.Ct. 146, 7 L.Ed.2d 91 (1961), the Supreme Court remanded the case to the Michigan Supreme Court for consideration in light of Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961), which had been decided shortly after the filing of Winkle's petition for certiorari. On remand, the Michigan Supreme Court again denied relief. In re Winkle, 372 Mich. 292, 125 N.W.2d 875 (1964), cert. denied, 379 U.S. 645, 85 S.Ct. 611, 13 L.Ed.2d 551 (1965), *534 rehearing denied, 380 U.S. 967, 85 S.Ct. 1102, 14 L.Ed.2d 157 (1965). Having thus exhausted the remedies provided by the state, Winkle filed the instant petition.
The facts of the case are these. At approximately 2:00 a. m. on July 21, 1957, in Madison Township, Michigan, state policemen Golm and Pandol observed a car make a left turn against a red light and proceed to a motel 100 feet further along the highway. The car was driven by Winkle, who was accompanied by Lee Casteel. The troopers followed the Winkle car up to the motel driveway, honking twice. Winkle, who had previously telephoned the motel to inquire about accommodations, got out out of the car and walked toward the police car, and met Golm on the way. While Golm was conversing with Winkle, Pandol questioned Casteel.
Golm informed Winkle that the car had been stopped because it went through a red light. Golm asked for Winkle's driver's license, and Winkle displayed a Florida license bearing the name of George Henry Winkle. Winkle also displayed registration bearing the name of Henry Williams and explained that the car belonged to his brother-in-law. Winkle told Golm that he and his companion (whom he referred to as Philbrick, although his name was Casteel) intended to go fishing for 2 or 3 weeks around Detroit, and then return to Indianapolis, where he lived in a motel and his companion lived in an apartment on Central Avenue. In the meantime, Casteel told Pandol that he was going to see some girls in Toledo and return to Indianapolis in a few days, where he and Winkle shared an apartment on Central Avenue. Golm later questioned Casteel and Pandol questioned Winkle, and, although it is disputed, we accept the conclusion of the Michigan Supreme Court that both officers were aware of the conflicting stories.
Following the questioning, Pandol removed the keys from the ignition of the car and opened the trunk, where he found drills, chisels, keys, nitroglycerine, and other items ultimately introduced to prove Winkle's possession of burglar tools. Also found in the trunk was a bowling ball bag, which contained the 38-caliber revolver introduced to prove Winkle's possession of a concealed weapon.
When Golm was cross-examined at Winkle's trial, the following colloquy took place:
Q. Mr. Pandol came to the back of the car with the keys he had just obtained from the ignition, you had no reason to believe then that a felony was being committed in your presence?
A. Well, at the time I thought that something was strange, because of the two different stories that they had given us. We suspected something.
Q. I am talking about felony. You had no reason to suspect a felony was being committed in your presence?
A. No, not actually, no.
Q. And you had no information that a felony had been committed by the defendant?
A. That's correct.
And the following transpired during the cross-examination of Pandol:
Q. Let me ask now again: In your opinion, what is it that you expected to find by a search of that automobile to establish that particular violation?
A. When you search a car you never know what you are going to find.
Q. That isn't what I asked you, Trooper Pandol. Believe me, I know you never know what you are going to find when you start searching. That I know too.
But the question I want answered is: What, in your opinion, did you think you needed to find in order to be able to charge the occupants of that car with the violation that you saw committed in front of you?
Mr. Glaser: I am going to object to the use of the word, occupants. You certainly couldn't charge both occupants.

*535 Q. The occupant, the driver of the car.
A. Nothing.
Mr. Glaser: You mean Mr. Winkle?
Mr. Tucker: Yes.
Q. (Continuing): What did you expect to find that would substantiate the fact that this misdemeanor had been committed by him?
A. Well, I wouldn't say we expected to find anything as far as the misdemeanor was concerned.
Q. All right. Fine. Is that your answer? I don't want to stop you, if you have got anything further to say.
A. As far as the red light was concerned, probably nothing.
Q. All you had to do at that point was to determine whether they were residents or non-residents and whether or not to issue a ticket or not issue a ticket, or not take them in or take them in?
A. Yes.
Q. Nothing in and about that automobile that would help you to determine whether or not a crime was committed, or a misdemeanor committed?
A. No, sir.
Q. Yet nevertheless you went up there without permission of anyone, took the keys out of the dash board, went back and opened the trunk of the car. Isn't that true?
A. That's correct.
Q. You didn't, I am assuming you didn't, get any permission from either Mr. Winkle or the now deceased passenger?
A. No, sir they were under arrest.
Q. Pardon?
A. They were under arrest.
Q. Had you apprised them of that?
A. No, I hadn't apprised them of it, as far as I was concerned, they were under arrest.
Q. Had you communicated that to them?
A. I hadn't directly told them they were under arrest, no.
Q. OK., that's your answer?
A. Yes.
Q. So without having apprised them of that fact, you still proceeded to make a complete and thorough search of that automobile?
A. That's right.
Q. Now, before this discovery that you made by reason of the search, nothing up to that point had created any suspicion on your part that these men were involved in the commission of a felony?
A. No, sir.
Q. It is only when you opened the trunk and saw its contents is when you made this discovery these men were in possession of contraband, as it were?
A. That's right.
Q. And it is then you placed them under arrest?
A. For the felony, yes.
In considering Winkle's contention that the search of the car violated his rights under the United States Constitution, attention will first be directed to the matter of the reasonableness of the search. Only if the search is found to be unreasonable need there be any discussion of the proviso of the Michigan Constitution set forth above.

I
Seven of the justices of the Michigan Supreme Court considered Winkle's request for post-conviction relief, and all seven determined that the warrantless search had met the standard of reasonableness established by the Fourth Amendment. The justices differed, however, in the reasoning upon which their common conclusion rested.[1]
*536 Justice Kelly, with whom Justice O'Hara concurred, stated:
The facts and conflicting statements of petitioner and his associate were completely inconsistent and irreconcilable with those of innocent travelers on the highway.
These facts would not only justify a law-enforcing officer who was reasonably discreet and prudent to conduct the search that uncovered the nitroglycerin, detonator caps, and a complete set of burglar tools, plus a concealed weapon, but were of such a nature that any failure to conduct the investigation, such as the troopers conducted in this case, would have constituted action that would justify reprimand for failure to carry out their duty. 372 Mich. at 303, 125 N.W.2d at 881.
It is difficult to determine, from this rather general statement, precisely what rendered the search reasonable in the eyes of these justices. Although Winkle's actions may have been "completely inconsistent" with those of an "innocent traveler," they would have had to suggest the commission of a particular offense and the relation of the automobile to that offense in order to render a search reasonable. Even in the case of a search of an automobile, which, because of its mobility, presents problems different from those arising from the search of a fixed structure, probable cause involves "more than bare suspicion." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); see also Preston v. United States, 376 U.S. 364, 366-367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). Justice Dethmers expressed agreement with the opinion of Justice Kelly, but went on to state his understanding of that opinion:
For the reasons stated in the first portion of Mr. Justice Kelly's opinion, holding that the search and seizure were not unreasonable or unlawful for the reason that they were based upon probable cause on the part of the officers to believe that there was in the automobile, or might be, evidence that a crime had been, or was being committed, I concur * * *. 372 Mich. at 326, 125 N.W.2d at 892.
This opinion, although it may express a correct statement of the law, comes no closer to suggesting just what offense appeared to have been committed and how it was related to the automobile.
The separate opinion of Justice Souris, joined by Justices Kavanagh and Smith, does suggest that probable cause existed to believe that a specific offense had been committed, and that the officers could therefore validly conduct a warrantless search of the automobile:
At the time the search commenced, from the interrogation of defendant and his companion the troopers had probable cause to believe (whether they actually did so believe is beside the point in determining the reasonableness of the search and seizure) that the automobile had been stolen. They then knew that the automobile was not owned by either occupant; that, although defendant claimed to be a resident of Indiana, he carried a Florida driver's license; and that, because of the conflicting stories the occupants of the car told the troopers, either or both of the occupants had lied about their residences and their destinations. Considering also the fact that the troopers' encounter with defendant and his companion at 2 o'clock in the morning and that their interest was aroused initially by the defendant's haste in making a turn in violation of a traffic control signal, I cannot conceive, any more than can Justice Kelly, what justification there could have been had the troopers failed to make a search such as they did make. 372 Mich. at 327-328, 125 N.W.2d at 893.
This reasoning, however, is also incapable of sustaining the search. First, it may be seriously doubted that the facts marshaled by the Justice do indeed give rise to an inference that the car had been stolen. Second, even if it could have been inferred that the car had been stolen, it is not at all certain that this fact rendered a search of the trunk permissible, *537 although the opinion of the Supreme Court in Preston v. United States, supra, suggests in dictum that such a search might be unobjectionable. 376 U.S. at 367-368, 84 S.Ct. 881. Because of the mobility of automobiles, the Supreme Court has allowed these vehicles to be searched without a warrant if there is probable cause to believe that an offense has been committed and that fruits or instrumentalities of the offense can be found in the car. Brinegar v. United States, supra; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). However, even if it was reasonable to have assumed that the car had been stolen, it is difficult to see what evidence of this offense would have been disclosed by a search of its trunk. Finally, whatever the validity of the two prior observations, there is another fatal flaw in the opinion. The Justice erred in stating that the belief of the officers is irrelevant in determining the existence of probable cause. As this issue is usually presented, the searching officer claims he believed that an offense had been, or was being, committed, and the court then tests his belief against the standard of whether a "prudent man" would arrive at the same belief under the circumstances. Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). The use of the "prudent man" test, however, should not obscure the point that it is the belief of the officer which is being tested for its reasonableness. See Carroll v. United States, supra, 267 U.S. at 156, 45 S.Ct. at 286: "The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony * * *" (emphasis added). In this case, the officers specifically denied having believed that any offense other than the traffic violation had occurred and stated no belief that a search of the trunk would disclose relevant evidence. Hence, the question of what a prudent man would have believed under the circumstances does not even arise.
Respondent, in its brief in the instant case, advances an additional ground upon which it might be held that the search was a reasonable one. Respondent observes that Winkle had been arrested for the traffic violation, and that the warrantless search of the automobile should therefore be held valid as incident to a lawful arrest. Respondent recognizes that the Supreme Court of Michigan has recently decided that detention for a traffic violation cannot by itself support a search of the car. People v. Gonzales, 356 Mich. 247, 97 N.W.2d 16 (1959). Respondent argues, however, that special circumstances, such as the need to protect the arresting officer or the need to prevent destruction of evidence can justify a warrantless search incident to a lawful arrest. As a generalization, this is certainly true. See Preston v. United States, supra, 376 U.S. at 367, 84 S.Ct. 881. This generalization, however, does not apply to the search made in this case. It is difficult to see how anything in the locked trunk placed the officers in any immediate danger.
With all due deference to the reasoning of the Justices of the Michigan Supreme Court and of the respondent in this proceeding, this court is constrained to hold that the search of the Winkle car did not meet the standard of reasonableness established by the Fourth Amendment. It is therefore necessary to determine whether the proviso in Article II, § 10 of the Michigan Constitution of 1908 can render evidence discovered through such a search admissible in a criminal proceeding.

II
The proviso involved here does not by its terms permit unreasonable search and seizure. Rather, it purports to render admissible certain evidentiary items obtained through searches and seizures. During the reign of Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the contention could not successfully have been advanced that this proviso was constitutionally *538 objectionable, because the Supreme Court held in Wolf that illegally-seized evidence, though excludable in the federal courts, did not have to be excluded in the courts of the several states. In Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), however, the Supreme Court held that the exclusionary rule was to be applied to the states. The Michigan proviso appears to collide directly with the teaching of Mapp, with respect to the classes of property enumerated, and the question here is whether the proviso can survive the collision.
In considering Winkle's request for post-conviction relief, the Michigan Supreme Court, unlike this court, did not have to consider the constitutionality of the proviso because it found the search to have been reasonable. Justice Kelly, however, did consider the question, and was joined in his opinion by Justice O'Hara. He found the proviso to be constitutional, and he appears to advance three grounds: (1) the proviso can be construed to admit only that evidence which has been obtained through reasonable searches and seizures; (2) the facts of Mapp differed sufficiently from the facts of Winkle to render Mapp inapplicable to the proviso as applied in this case; and (3) the Supreme Court, in cases subsequent to Mapp, has indicated that the states are to have some leeway in establishing appropriate rules for searches and seizures.
The first ground, mentioned only briefly in the Justice's opinion, is apparently adopted from the brief amicus curiae filed in the Michigan Supreme Court by the State Bar of Michigan Committee on Criminal Jurisprudence. The brief argues essentially that the proviso is found in a section of the Michigan Constitution which forbids unreasonable searches and seizures, and that the proviso should therefore not be read as allowing the admission of evidence resulting from an unreasonable search. The answer to this argument, it would seem, is that the very purpose of a proviso is to make an exception to a general rule. If the purpose of the proviso were merely to allow reasonably-seized evidence to be introduced, there would be no need for it. In any event, if the construction of the State Bar Committee is correct, the proviso does not apply to this case, where the evidence resulted from an unreasonable search.
The State Bar Committee brief appears to advance a further argument: it is undisputed that, incident to a lawful arrest, a search can be conducted for items which would endanger the arresting officer or which could be used for purposes of escape. Since many of the items mentioned in the proviso could be used to cause harm or to effectuate an escape, the proviso is constitutional. The obvious fallacy in this argument is its assumption that because an object can potentially cause harm, it is always seized for the purpose of preventing harm. The instant case provides a sufficient illustration. The revolver seized by the officers was taken from a bowling bag in a locked trunk. As observed earlier, it is difficult to view this object as a source of immediate harm. No doubt cases will arise where the objects named in the proviso can be constitutionally applied, although it will be entirely superfluous since the objects could be introduced anyway. The arguments of the State Bar Committee, however, do not in any way indicate that the proviso can be applied constitutionally in the present case.
Justice Kelly's second ground, the factual distinctions between Mapp and Winkle, has greater logical coherence than the first ground, but no greater legal persuasiveness. It is true that Miss Mapp's home was searched, while in this case the search involved an automobile. It is true that the officers in Mapp may have physically harmed the party involved, while the present situation is devoid of any evidence of official viollence. It is true that only booksalbeit pornographic  were seized from Miss Mapp, while here the officers found instruments of destruction. Perhaps the only similarity between the two cases is *539 that the search was unreasonable. This, however, is enough to deny admission in evidence to its fruits.
Finally, Justice Kelly observes that in Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) the Supreme Court stated: "Mapp, however, established no assumption by this Court of supervisory authority over state courts * * * and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law." 374 U.S. at 31, 83 S.Ct. at 1629. No less important, however, is the Supreme Court's statement that variety among the states "implies no derogation of uniformity in applying federal constitutional guarantees." 374 U.S. at 34, 83 S.Ct at 1630. While the states are permitted, indeed encouraged, to develop appropriate methods of law enforcement for the protection of their citizens, the Bill of Rights cannot be ignored in the process. Whatever innovations might be devised in the area of searches and seizures, it would seem that one thing which cannot be done is to justify a search by its results. It must therefore be held that the proviso, as applied in this case, is violative of the Fourth Amendment.
The court has read with great interest the portions of the opinion of the Michigan Supreme Court detailing the legislative history of the proviso which is here under consideration. The court is aware that the serious problems of our society, among which crime is certainly to be counted, demand creative and effective solutions. This opinion, however, is written in the firm conviction that its holding will in no way prevent such solutions from being found.
For the reasons stated, I find that petitioner is being held in violation of his constitutional rights and it is therefore ordered that petitioner be released from custody, unless he is granted a new trial within 30 days, during which new trial the evidence discussed herein shall not be admitted. The Court expresses its appreciation to D. Michael Kratchman, Esq. of the Michigan Bar, who ably represented petitioner as assigned counsel.
NOTES
[1] Justice Black, the remaining member of the court, merely concurred in the result, so it cannot be determined upon which, if any, of the lines of reasoning he relied.